[Cite as *Vacheresse v. Paulchel*, 2023-Ohio-3226.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Theresa L. Vacheresse, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 22AP-583 |
| v. | : | (C.P.C. No. 20DR-0244) |
| Ronnie A. Paulchel, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on September 12, 2023

**On brief:** *Smith, Meier & Webb, LPA*, and *Mark D. Webb* for appellant. **Argued:** *Mark D. Webb*.

**On brief:** *Mary C. Ansbro* for appellee. **Argued:** *Mary C. Ansbro*.

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations

EDELSTEIN, J.

{¶ 1} Plaintiff-appellant, Theresa L. Vacheresse, appeals from the August 31, 2022 judgment entry and final divorce decree of the Franklin County Court of Common Pleas, Division of Domestic Relations. On appeal, Ms. Vacheresse takes issue with the trial court's division of marital assets and valuation of marital real estate. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL OVERVIEW

{¶ 2} Ms. Vacheresse and defendant-appellee, Ronnie A. Paulchel, were married in 2002. No children were born or adopted as issue of the marriage. Because they were married later in life, the parties brought established careers, assets, and debts to the

marriage. During their marriage, the parties also accumulated significant assets, including three residences, two businesses, several motor vehicles, bank accounts, and airline miles.

{¶ 3} Prior to and during their marriage, Ms. Vacheresse worked for Mr. Paulchel at the Good Feet franchise store (LivWell LLC) he owned before they were wed. During their marriage, the parties created two new business entities together, LivWell II, LLC and LivWell III, LLC, whose sole assets are likewise franchises of Good Feet stores. Although Ms. Vacheresse had a doctorate of podiatric medicine, she was not working in that capacity during the parties' relationship and marriage.

{¶ 4} In 2020, Ms. Vacheresse filed a complaint for divorce. Two weeks later, Mr. Paulchel filed his answer and counterclaim. Although many contested matters arose during the pendency of litigation in the court below, most are not relevant to our determination of the issues before us. Suffice it to say the divorce proceedings were heavily litigated and not particularly amicable.

{¶ 5} The trial court held a five-day divorce trial in November/December 2021. As part of that trial, the parties filed joint stipulations on November 17, 2021, which were accepted by the trial court and admitted into the record. Among other things, the parties agreed on the values of many assets and the division of some assets. At trial, both parties testified extensively about their various assets and debts. Mr. Paulchel also presented testimony from Kathee Ingram, his business accountant, and Michael Crolius, his business organizer and friend. After the trial concluded, the parties submitted written closing arguments and proposed decrees of divorce.

{¶ 6} On August 31, 2022, the trial court issued a decision with findings of fact and conclusions of law on the various issues contested by the parties. In relevant part, the trial court ordered that Mr. Paulchel retain his brokerage accounts and IRA accounts—valued at approximately $1,434,136—and Ms. Vacheresse retain her IRA account of $26,014. (Aug. 31, 2022 Divorce Decree at 7-8, 18.)

{¶ 7} The trial court also ordered the real estate located at 855 W. Coshocton Street in Johnstown, Ohio be sold and the parties equally divide the net proceeds of its sale. (Divorce Decree at 17.) In the alternative, the trial court afforded Mr. Paulchel the option to refinance the home and buy out Ms. Vacheresse's portion of her equity in the home. (Divorce Decree at 17.) At trial, the parties disagreed on the value of this asset, with each

testifying as to their own estimations of its value.[1]  (Divorce Decree at 4.)  Ms. Vacheresse opined its value was $1,000,000 at the time of trial (Nov. 18, 2021 Trial Tr. Vol. II at 94; Nov. 30, 2021 Trial Tr. Vol. III at 191-93), while Mr. Paulchel approximated its value was $420,000 (*see* Dec. 1, 2021 Trial Tr. Vol. IV at 370-84).

{¶ 8}  Of note, the parties had the Johnstown home appraised prior to trial.  (Tr. Vol. II at 187-89; Tr. Vol. III at 381-82.)  Although Mr. Paulchel paid for the appraisal, he permitted Ms. Vacheresse's counsel to select the appraiser.  (*See* Tr. Vol. II at 187-89; Tr. Vol. III at 381-82.)  Her attorney chose Samuel D. Koon & Associates, who appraised the Johnstown home at $575,000. (*See* Trial Ex. B.)  Ms. Vacheresse testified she did not agree with that appraised value, but conceded she did not have a realtor's license, real estate appraisal certificate, real estate sales experience in the area, or a substantive basis for challenging the qualifications of the appraiser selected by her attorney.  (*See* Tr. Vol. III at 188-93.)   Although Mr. Paulchel believed the appraiser overvalued the property, he nonetheless indicated his amenability to the appraiser's $575,000 valuation.  (Tr. Vol. IV at 370-71. *See* Tr. Vol. III at 189; Trial Ex. B.)  Neither party called the appraiser as a witness at trial, but the appraisal report was admitted into evidence at the close of trial, without objection from Ms. Vacheresse's trial counsel.  (Dec. 2, 2021 Trial Tr. Vol. V at 593-96. *See* Trial Ex. B.)

{¶ 9}  Ultimately, the trial court found that Ms. Vacheresse's assessment of the Johnstown property's value was not "of sufficient credibility to overrule by almost doubling a professional appraiser's valuation."  (Divorce Decree at 4.)  In accepting the appraised value of $575,000, the trial court "note[d] the extensive appraisal report, its meticulous cataloguing of methodology, sources, and extensive supporting materials to justify its valuation."  (Divorce Decree at 4.)  On appeal, Ms. Vacheresse asserts in her second assignment of error that the trial court erred in admitting and relying on the appraisal's valuation of the Johnstown home.

---

[1] The parties also disagreed on whether it was an entirely marital asset (Ms. Vacheresse's position) or if it had some separate property contained within its equity (Mr. Paulchel's position). (Divorce Decree at 4.) The trial court found Mr. Paulchel failed to prove the separate nature of any part of the home by a preponderance of the evidence. (Divorce Decree at 4.) Mr. Paulchel did not cross-appeal, so the propriety of that finding is not before us.

{¶ 10} After all allocations were ordered, the trial court recognized its distribution of the marital assets—which totaled $7,359,385—was not entirely equal. (Divorce Decree at 20.) Nonetheless, the court declined to order an equalization payment, thus leaving Ms. Vacheresse with a net marital asset distribution of 45.10 percent and Mr. Paulchel with 54.90 percent of the total marital assets. (Divorce Decree at 21.) In her first assignment of error, Ms. Vacheresse challenges the trial court's failure to equalize the marital assets.

{¶ 11} Ms. Vacheresse timely appealed from the trial court's August 31, 2022 judgment and asserts two assignments of error for our review:

> [I.] THE COURT ABUSED ITS DISCRETION AND DID NOT MAKE AN EQUITABLE DIVISION OF PROPERTY IN FAILING TO EQUALIZE THE MARITAL ASSETS OF THE PARTIES.
>
> [II.] THE TRIAL COURT ABUSED ITS DISCRETION IN RELYING UPON AND ADMITTING INAPPROPRIATE EVIDENCE AND IN THE VALUATION AND DISPOSITION OF THE MARITAL REAL ESTATE LOCATED AT 855 W. COSHOCTON, JOHNSTOWN, OHIO.

## II. ANALYSIS

{¶ 12} Ms. Vacheresse's first and second assignments of error relate to the trial court's division of marital property and valuation of the Johnstown residence, respectively. Because a trial court's valuation determinations precede its equitable division analysis, we address her two assignments of error in reverse order.

### A. Law and Standards of Review

{¶ 13} In divorce proceedings, the trial court is required to determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). Upon making such determinations, the trial court must divide the marital and separate property equitably, between the spouses, in accordance with R.C. 3105.171. R.C. 3105.171(B).

{¶ 14} R.C. 3105.171(C)(1) generally provides that marital property shall be divided equally, unless an equal division would be inequitable, in which case the property shall be divided in the manner the trial court determines equitable. To do this, the trial court must value the marital property to determine an appropriate division. *See Raymond v. Raymond*, 10th Dist. No. 11AP-363, 2011-Ohio-6173, ¶ 22.

{¶ 15} A domestic relations court enjoys broad discretion in valuing and fashioning a division of marital property. *See, e.g., Fernando v. Fernando*, 10th Dist. No. 16AP-788, 2017-Ohio-9323, ¶ 25-26; *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 95 (1988); *Sangeri v. Yerra*, 10th Dist. No. 19AP-675, 2020-Ohio-5520, ¶ 25. Thus, we generally review the overall appropriateness of a trial court's determination of marital property division in divorce proceedings under an abuse-of-discretion standard. *See, e.g., Teeter v. Teeter*, 18 Ohio St.3d 76 (1985), citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981).

{¶ 16} "[A]buse of discretion connotes that the court's attitude is unreasonable, arbitrary, or unconscionable." (Internal quotations omitted.) *State v. Weaver*, ____ Ohio St.3d ____, 2022-Ohio-4371, ¶ 24, quoting *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A decision is unreasonable if there is no sound reasoning process that would support the decision." (Internal quotations omitted.) *Fernando* at ¶ 7, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances." (Internal quotations omitted.) *State v. Hill*, ____ Ohio St.3d ____, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). A decision may also be arbitrary if it lacks any adequate determining principle and is not governed by any fixed rules or standards. *See Beasley* at ¶ 12, citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), citing *Black's Law Dictionary* 96 (5th Ed.1979). *See also State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, ¶ 19. A decision is unconscionable if it "affronts the sense of justice, decency, or reasonableness." *Fernando* at ¶ 7, citing *Porter, Wright, Morris & Arthur, LLP v. Frutta Del Mondo, Ltd.*, 10th Dist. No. 08AP-69, 2008-Ohio-3567, ¶ 11.

{¶ 17} An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.). *See also New Asian Super Mkt. v. Jiahe Weng*, 10th Dist. No. 17AP-207, 2018-Ohio-1248, ¶ 16.

### B. Second Assignment of Error

{¶ 18} Ms. Vacheresse's second assignment of error relates to the trial court's valuation of the Johnstown property. Ms. Vacheresse testified she believed it was worth approximately $1,000,000 (Tr. Vol. II at 94), whereas Mr. Paulchel estimated its value at $420,000 (Tr. Vol. IV at 370). At trial, Mr. Paulchel also produced an appraisal report—from an appraiser selected by Ms. Vacheresse's trial counsel—which valued the Johnstown property at $575,000. (*See* Tr. Vol. III at 188-94; Tr. Vol. IV at 370-87; Trial Ex. B.) Although the trial court sustained objections to trial counsel's attempt to question Ms. Vacheresse about this report (Tr. Vol. III at 190-91, 260-63), the appraisal report was nonetheless admitted as evidence without objection at the close of trial (Tr. Vol. V at 593-96). Neither party called its authors to testify at trial, and Ms. Vacheresse did not present any expert evidence—e.g., a report from another appraiser or testimony from a qualified realtor—concerning the value of the Johnstown property at trial.

{¶ 19} On appeal, Ms. Vacheresse asserts the trial court erred and abused its discretion by admitting and relying on the appraisal report to determine the value for the Johnstown residence. For the following reasons, we disagree.

### 1. Legal Standards

{¶ 20} "R.C. 3105.171 expresses no specific way for the trial court to determine valuation." *Banchefsky v. Banchefsky*, 10th Dist. No. 09AP-1011, 2010-Ohio-4267, ¶ 43, citing *Focke v. Focke*, 83 Ohio App.3d 552, 554 (10th Dist.1992). Furthermore, " 'Ohio courts have not specified that only one method of valuation is appropriate when dividing marital property.' " *Kuper v. Halbach*, 10th Dist. No. 09AP-899, 2010-Ohio-3020, ¶ 12, quoting *Herrmann v. Herrmann*, 12th Dist. No. CA99-01-006, 2000 Ohio App. LEXIS 5146, *14 (Nov. 6, 2000). Accordingly, "[w]hen determining the value of marital assets, a trial court is not confined to the use of a particular valuation method, but can make its own determination as to valuation based on the evidence presented." *Day v. Day*, 10th Dist. No. 08AP-440, 2009-Ohio-638, ¶ 10, citing *James v. James*, 101 Ohio App.3d 668, 681 (2d Dist.1995). *See also Smoyer v. Smoyer*, 10th Dist. No. 18AP-365, 2019-Ohio-3461, ¶ 40.

{¶ 21} It is well-established, then, that a trial court generally has broad discretion to develop some measure of value. *See, e.g., Berish v. Berish*, 69 Ohio St.2d 318 (1982); *Sangeri*, 2020-Ohio-5520 at ¶ 25. Thus, the "valuation of marital assets is typically a

factual issue that is left to the discretion of the trial court." *Roberts v. Roberts*, 10th Dist. No. 08AP-27, 2008-Ohio-6121, ¶ 18, citing *Berish* at 319. *See also Raymond*, 2011-Ohio-6173 at ¶ 22; *Day* at ¶ 11.

**{¶ 22}** " 'Although a trial court enjoys broad discretion in determining the value of a marital asset, such discretion is not without limit.' " *Fernando*, 2017-Ohio-9323 at ¶ 26, quoting *Apps v. Apps*, 10th Dist. No. 02AP-1072, 2003-Ohio-7154, ¶ 38. "A trial court's assignment of an asset's value must be based upon competent, credible evidence," meaning "evidence that is both competent, credible evidence of value and a rational basis upon which to establish the value." *Warren v. Warren*, 10th Dist. No 09AP-101, 2009-Ohio-6567, ¶ 15. That is to say, "[a] trial court must have a rational evidentiary basis for assigning value to marital property." *Fernando* at ¶ 26. *See also Dach v. Homewood*, 10th Dist. No. 14AP-502, 2015-Ohio-4191, ¶ 36.

**{¶ 23}** " 'An appellate court's duty is not to require the adoption of any particular method of valuation, but to determine whether, based upon all the relevant facts and circumstances, the court abused its discretion in arriving at a value.' " *Fernando* at ¶ 26, quoting *Apps* at ¶ 38. Because this court is not a trier of fact, our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment. *See, e.g.*, *Miller v. Miller*, 10th Dist. No. 18AP-877, 2021-Ohio-4573, ¶ 15; *Tennant v. Martin-Auer*, 188 Ohio App.3d 768, 2010-Ohio-3489, ¶ 16 (5th Dist.). We must uphold " 'a trial court's determination of valuation which is based upon competent, credible evidence absent a showing of an abuse of discretion.' " *Banchefsky* at ¶ 43, quoting *Moro v. Moro*, 68 Ohio App.3d 630, 637 (8th Dist.1990).

### 2. Analysis

**{¶ 24}** On appeal, Ms. Vacheresse contends the trial court erred when it admitted the appraisal report as evidence of the Johnstown property's value because neither of its authors—Brian J. Sapp and Samuel D. Koon of Samuel D. Koon & Associates—appeared as a witness to testify and be subject to cross-examination about it. She also argues the trial court abused its discretion in relying on this report to value the Johnstown property.

**{¶ 25}** " 'Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence.' " *State v. L.E.F.*, 10th Dist. No. 13AP-1042,

2014-Ohio-4585, ¶ 4, quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). Accordingly, an appellate court generally limits its review of a trial court's admission or exclusion of evidence to whether the trial court abused its discretion. *Id.*, citing *Reinoehl v. Trinity Universal Ins. Co.*, 130 Ohio App.3d 186, 195 (10th Dist.1998).

{¶ 26} Ms. Vacheresse concedes, however, that her trial counsel did not object to the admission of the appraisal report that she now alleges was erroneously admitted by the trial court. (Appellant's Brief at 22.) But, she nonetheless "asserts that plain error is not appropriate" because her trial counsel objected to the report when she was questioned about it on cross-examination. (Appellant's Brief at 23.) That argument is not well-taken.

{¶ 27} It is well-established that "[g]enerally, when a party fails to renew an objection at the time exhibits are admitted into evidence, that party waives the ability to raise the admission as error on appeal, unless plain error is shown." *Odita v. Phillips*, 10th Dist. No. 09AP-1172, 2010-Ohio-4321, ¶ 56, citing *Nicula v. Nicula*, 8th Dist. No. 84049, 2009-Ohio-2114. *See also State v. Smith*, 80 Ohio St.3d 89, 107 (1997). Because Ms. Vacheresse's trial counsel failed to object to the admission of the appraisal report as an exhibit at the time Mr. Paulchel's counsel moved to admit it into evidence, we limit our review to whether the alleged error rises to the level of plain error. Evid.R. 103(A)(1), (D).

{¶ 28} "In civil cases, courts apply the doctrine of plain error 'with the utmost caution.' " *Marshall v. Marshall*, 10th Dist. No. 18AP-543, 2019-Ohio-684, ¶ 8, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). Courts find plain error " 'only in the extremely rare case involving exceptional circumstances where error * * * seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *Id.*, quoting *Goldfuss* at syllabus.

{¶ 29} Ms. Vacheresse has not presented this court with any argument explaining how the trial court's alleged error in admitting the appraisal report for the Johnstown home undermined the legitimacy of the judicial process in this case. Instead, she generally claims "the admission of and reliance upon [the] valuation [contained in that report] did seriously affect the process and [her] substantial rights[,]" without explaining why she believes that is so. (*See* Appellant's Brief at 23.) Ms. Vacheresse cites to the "amount of discrepancy at issue" and her "failure to confront" the appraiser about the valuation as issues that bore out from the erroneous admission of the report. (*See* Appellant's Brief at 23.) But even

assuming the admission of this appraisal report was erroneous, we do not find its admission undermined the legitimacy of the judicial process given the facts and circumstances of this case. Thus, we decline to address whether the trial court plainly erred in admitting the appraisal report because we find that, even if it did, Ms. Vacheresse does not sufficiently establish she was prejudiced by its admission, for the reasons that follow.

{¶ 30} Ms. Vacheresse's trial counsel selected the appraiser for the Johnstown property. (*See* Tr. Vol. III at 188-89; Tr. Vol. IV at 381-82.) Evidence in the record suggests a copy of the report was sent to Ms. Vacheresse's trial counsel on April 19, 2021. (*See* Trial Ex. B.) At trial, Ms. Vacheresse's attorney did not contest the qualifications of the appraiser she selected. Nor did Ms. Vacheresse's trial counsel claim the report relied on inaccurate information or unaccepted methods of valuation. And although neither party agreed with the appraiser's valuation of the Johnstown property, only Mr. Paulchel indicated a willingness to accept it. (*See* Tr. Vol. IV at 370-87.)

{¶ 31} Neither party called the appraiser to testify about the report at trial. And, other than offering their own lay opinions about the value of the property, neither party presented alternative expert evidence concerning the value of the Johnstown property. While there is no general burden of proof with respect to the division of property, " '[e]ach side has the burden of going forward with evidence as to any [R.C. 3105.18(C)(1)] factor which it wants considered, bringing forth facts tending to prove its version of the manner in which such factors should be applied.' " *Banchefsky v. Banchefsky*, 10th Dist. No. 13AP-300, 2014-Ohio-899, ¶ 28, quoting *Barrientos v. Barrientos*, 3d Dist. No. 5-12-13, 2013-Ohio-424, ¶ 37, citing *Stetler v. Stetler*, 6 Ohio App.3d 29 (3d Dist.1983). *See also Reichert v. Reichert*, 3d Dist. No. 8-90-21, 1992 Ohio App. LEXIS 294, *4-5 (Jan. 17, 1992).

{¶ 32} Because her trial counsel received the report months before the divorce trial commenced (*see* Trial Ex. B), Ms. Vacheresse had ample time to seek an alternative expert opinion that was more in-line with the valuation she felt was appropriate. Yet, Ms. Vacheresse presented no such expert opinion at trial. She did not offer her own appraisals into evidence or call any qualified experts to testify about their assessment of the Johnstown property's value. Thus, Ms. Vacheresse submitted ***no evidence*** to establish, or support

her testimony, that the Johnstown property should be valued at $1,000,000.[2]

{¶ 33} In contrast, Mr. Paulchel presented an appraisal report from an appraiser Ms. Vacheresse's trial counsel selected. Although the trial court sustained objections concerning trial counsel's questioning of Ms. Vacheresse about the report on the third day of trial (Tr. Vol. III at 190-91, 260-63), Mr. Paulchel was permitted to testify about that appraisal on the fourth day (*see* Tr. Vol. IV at 370-87). And, most critically, when Mr. Paulchel's trial counsel moved to admit the appraisal report as evidence on the fifth day, Ms. Vacheresse's attorney did not object to its admission. (Tr. Vol. V at 593-96.)

{¶ 34} In supplemental briefing ordered by this court, the parties agree the trial court's valuation of the Johnstown property had virtually no impact on the trial court's equitable division analysis. (Aug. 21, 2023 Appellant's Supp. Brief at 1; Aug. 21, 2023 Appellee's Supp. Brief at 4. *See* Divorce Decree at 4.) Indeed, this is because the trial court ordered the parties to sell all three marital properties and equally divide the net proceeds of those sales. (Divorce Decree at 16-17.) The trial court also gave Mr. Paulchel the option to refinance the Johnstown property and equally divide the equity in this home with Ms. Vacheresse. (Divorce Decree at 17.) The same option was extended to Ms. Vacheresse with respect to the Springboro property. (*Id.*) Furthermore, while the trial court relied on the admitted appraisal reports for both the Johnstown and Springboro properties to calculate each property's marital value[3] (Divorce Decree at 4-5), the parties acknowledge those values were not included in the trial court's marital asset distribution analysis (*see* Appellant's Supp. Brief at 1; Appellee's Supp. Brief at 4).

---

[2] We note that while Mr. Paulchel sought to retain the Johnstown property as his residence (Dec. 23, 2021 Def.'s Proposed Jgmt. Entry at 12-13), Ms. Vacheresse wanted the trial court to order the parties to sell it and divide the proceeds (Dec. 23, 2023 Pl.'s Proposed Findings of Fact/ Conclusion of Law at 5). We also note that Ms. Vacheresse requested to retain the Springboro residence, another contested marital asset, if the trial court did not order the parties to "sell everything and fairly divide it" (Tr. Vol. II at 99), and Mr. Paulchel was agreeable to Ms. Vacheresse retaining the Springboro residence if she bought him out of the equity on that house (Tr. Vol. III at 384-85). At trial, Ms. Vacheresse contested one appraiser's valuation of the Johnstown property, but agreed with another appraiser's valuation of the Springboro property. (*See* Tr. Vol. III at 193-94, 260-63.) She conceded, however, she was not aware of any difference in the qualifications, degrees, education, or knowledge between the two appraisers. (Tr. Vol. III at 193-94.)

[3] The trial court calculated the "marital value" of each property by determining the principal balance of the mortgage on the property and subtracting that number from the valuation set forth in the corresponding expert appraisal report. (*See* Divorce Decree at 4-5.)

{¶ 35} Based on the foregoing, we find the facts and circumstances of this case are not exceptional and do not give rise to plain error. We likewise find the trial court did not abuse its discretion in relying on the appraisal report, as described below.

{¶ 36} In determining the value of the Johnstown property, the trial court noted that Ms. Vacheresse testified she believed it was worth $1,000,000 and Mr. Paulchel asserted its value was approximately $420,000 but would be willing to agree to the $575,000 appraisal. (Divorce Decree at 4.) Ultimately, the trial court opined that Ms. Vacheresse's assessment of its valuation was not credible, "[o]r rather, of sufficient credibility to overrule by almost doubling a professional appraiser's valuation." (*Id.*) It also noted "the extensive appraisal report, its meticulous cataloguing of methodology, sources, and extensive supporting materials to justify its valuation." (*Id.*)

{¶ 37} Although Ms. Vacheresse attributes error to the trial court's admission ***and*** reliance on the appraisal report for the Johnstown property in her second assignment of error, the arguments she makes in support relate almost exclusively to the report's admission. To support her contention that the trial court abused its discretion in ***relying*** on this report when it valued the Johnstown property, Ms. Vacheresse essentially presumes its admission was error. That is to say, she has not presented this court with any substantive arguments explaining how or why the trial court's reliance on an exhibit admitted into evidence without objection from either party to determine the value of the Johnstown property constituted an abuse of discretion. Ms. Vacheresse does not argue, for instance, that the appraisal report itself was so inadequate or ineptly prepared, or relied on clearly improper facts, sources, and/or methodology, such that the trial court's reliance on this admitted trial exhibit was unreasonable, arbitrary, or unconscionable. And, again, we emphasize that Ms. Vacheresse did not present any competing expert evidence regarding the value of that property.

{¶ 38} Having already found the trial court's admission of the appraisal report did not constitute plain error, we thus find the trial court's determination that the Johnstown property's value is $575,000 is supported by some competent, credible evidence in the record. We further find the trial court did not err, plainly or otherwise, in finding Ms. Vacheresse's valuation assessment was not sufficiently credible to counter the professional appraiser's valuation where, as was the case here, the credentials of that appraiser were

never in dispute and Ms. Vacheresse had no expert credentials herself. Thus, the trial court did not err in basing the value of the Johnstown property on the only expert appraisal report admitted into evidence for that property.

{¶ 39} For these reasons, Ms. Vacheresse's second assignment of error is overruled.

### C. First Assignment of Error

{¶ 40} In her first assignment of error, Ms. Vacheresse asserts the trial court erred and abused its discretion when it found that an equalization payment of $360,875 from Mr. Paulchel to Ms. Vacheresse would be inequitable in this case. Because of this determination, the net marital assets were not equitably distributed; Ms. Vacheresse received 45.10 percent ($3,318,817.50) and Mr. Paulchel received 54.90 percent ($4,040,567.50) of the $7,359,385 total marital assets. Based on the record before us, however, we cannot say this constituted an abuse of discretion.

### 1. Legal Standards

{¶ 41} After determining what constitutes marital property and what constitutes separate property, a trial court is generally required to divide the marital and separate property equitably. R.C. 3105.171(B). With respect to marital property, R.C. 3105.171(C)(1) provides:

> Except as provided in this division or division (E) of this section, the division of marital property shall be equal. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section.

{¶ 42} Thus, although a trial court has broad discretion in determining property division, an equal distribution should be the starting point of the analysis. *Goebel v. Goebel*, 10th Dist. No. 15AP-61, 2015-Ohio-5547, ¶ 7, citing *Cherry*, 66 Ohio St.2d at 353.

{¶ 43} In making a division of marital property and in determining whether to make and the amount of any distributive award under this section to ensure equalization of the marital assets, a trial court considers the following factors:

1.   The duration of the marriage;

2. The assets and liabilities of the spouses;

3. The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;

4. The liquidity of the property to be distributed;

5. The economic desirability of retaining intact an asset or an interest in an asset;

6. The tax consequences of the property division upon the respective awards to be made to each spouse;

7. The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

8. Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

9. Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public pension;

10. Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.171(F). A trial court must evaluate all relevant facts in determining an equitable division. *Caleshu v. Caleshu*, 10th Dist. No. 19AP-742, 2020-Ohio-4075, ¶ 8, citing *Cherry* at 355.

{¶ 44} Because we review a trial court's division of property for an abuse of discretion, our job "is not to reweigh the evidence but to determine whether competent, credible evidence in the record supports the trial court's findings." *Caleshu* at ¶ 9, quoting *Hood v. Hood*, 10th Dist. 10AP-999, 2011-Ohio-3704, ¶ 14, citing *Dunham v. Dunham*, 171 Ohio App.3d 147, 2007-Ohio-1167, ¶ 27 (10th Dist.), and *Taub v. Taub*, 10th Dist. No. 08AP-750, 2009-Ohio-2762, ¶ 15.

{¶ 45} " 'The mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion.' " *Martin v. Martin*, 18 Ohio St.3d 292, 294 (1985), quoting *Cherry* at paragraph two of the syllabus.

### 2. Analysis

{¶ 46} In finding an equitable distribution payment of $360,875 would be inequitable in this case, the trial court stated the following:

> First and foremost, the primary assets driving the difference in distribution are [Mr. Paulchel's] investment accounts. The gap between [Mr. Paulchel] and [Ms. Vacheresse] can almost entirely be made up from [Mr. Paulchel's] accounts. But the [c]ourt notes [Mr. Paulchel] is older than [Ms. Vacheresse] and thus will likely be out of his prime earning years if not upon completion of this case[,] then shortly thereafter. [Ms. Vacheresse] will, with the acquisition of the Cincinnati and Dayton Good Feet stores have considerable income as well as time to make good any difference in this distribution. Further, both parties will likely see significant infusions of liquid capital via the sale of their personal real estate. If they do not, it will be because they desired to secure those pieces of property by buying the other out. In short, the parties have many options for securing their financial futures in a way that is not overly burdensome to the other. In the interest of fairness and equity, the [c]ourt therefore declines to order an equalization payment in this case.

(Aug. 31, 2022 Divorce Decree at 21.)

{¶ 47} Relatedly, we note that Mr. Paulchel was permitted to retain the Columbus Good Feet franchise (stipulated value $2,175,000) he owned before the marriage, which comprises of two brick-and-mortar stores. (Divorce Decree at 19. *See also* Nov. 17, 2021 Joint Stipulations at No. 9a; Tr. Vol. II at 35-36.) Ms. Vacheresse was awarded the Cincinnati and Dayton Good Feet franchises (stipulated values $1,174,000 and $1,512,000, respectively), which the parties acquired together during their marriage. (Divorce Decree at 19. *See also* Joint Stipulations at No. 9; Tr. Vol. II at 35-36.) At the time of trial, the Cincinnati and Dayton franchises each only had one existing store in their respective market areas. (*See* Tr. Vol. II at 35-36.)

{¶ 48} The trial court found this division of the parties' net marital assets—45.10 percent to Ms. Vacheresse and 54.90 percent to Mr. Paulchel—to be equitable for the following reasons:

> [T]he long duration of the marriage, the nature of the assets and liabilities of the parties, the liquidity of the property to be distributed, [Ms. Vacheresse's] current and future income, the economic desirability of retaining their respective business interests intact, both parties['] desire to retain their respective business interests, and the opportunities this distribution provides both parties.

(Divorce Decree at 21.)

**{¶ 49}** Despite acknowledging a trial court has broad discretion in determining the equitable division of marital property (Appellant's Brief at 26) and that "an equitable division [does] not [necessarily] mean equal" (Appellant's Brief at 10), Ms. Vacheresse nonetheless argues in her first assignment of error that the trial court abused its discretion in failing to order an equalization payment to her, and claims the trial court's distribution of marital property was inequitable. In support of that contention, Ms. Vacheresse does not allege the trial court failed to consider the appropriate statutory factors in reaching its decision on the equitable division of property. Nor does she contend the trial court failed to consider other relevant facts presented at trial.

**{¶ 50}** Instead, Ms. Vacheresse disagrees with the conclusions the trial court reached after considering those factors and relevant trial testimony. (*See* Appellant's Brief at 11-17.) More precisely, Ms. Vacheresse takes issue with the trial court's decision not to equally divide Mr. Paulchel's brokerage accounts totaling $1,233,389 and the parties' IRA accounts—Mr. Paulchel's valued at $200,747 and Ms. Vacheresse's valued at $26,014—between the parties. (Appellant's Brief at 11.)

**{¶ 51}** Having reviewed the record, we find the trial court appropriately considered multiple relevant statutory factors in R.C. 3105.171(F) and the relevant facts presented at trial. Furthermore, we find competent, credible evidence in the record supports the trial court's equitable division findings, including its determination that ordering an equalization payment would be inequitable in this case. Particularly significant to this determination, we believe, is the testimony presented at trial regarding the growth potential of the Cincinnati and Dayton Good Feet franchise "designated media areas" or "DMAs" (*see* Tr. Vol. II at 55) awarded to Ms. Vacheresse.

**{¶ 52}** Mr. Paulchel testified that he did not believe the Cincinnati DMA had been managed to its maximum potential because the franchise agreement expressly provides for two more stores to be opened in the Cincinnati area. (Tr. Vol. III at 298-300.) Thus, he opined that, if the trial court awarded that franchise to Ms. Vacheresse—which it ultimately did—Ms. Vacheresse would receive "more money than the appraised value" for that store because of the market value associated with the additional stores provided for in the Cincinnati's DMA franchise agreement. (*See* Tr. Vol. III 299-300; Tr. Vol. IV at 437-43.) Further, as to the Dayton DMA franchise, Mr. Paulchel testified that, although he stipulated

to its appraised value, he did not fully agree with it. (Tr. Vol. III at 304-05.) He claimed Dayton had the "best market" "[b]ecause there is always money in [its business] account, and it is the highest profit margin." (Tr. Vol. III at 304-06; Tr. Vol. IV at 439-41, 458.) He also indicated an opportunity existed to open another store in the Dayton DMA under its franchise agreement. (Tr. Vol. IV at 463-64.)

{¶ 53} Mr. Paulchel opined that both the Cincinnati and Dayton stores had a significant potential for increased sales. (Tr. Vol. III at 297-98, 304-06; Tr. Vol. IV at 437-43.) He also testified that he believed the Cincinnati DMA was "way undervalued compared to Columbus." (Tr. Vol. IV at 359-60.) And, of note, Ms. Vacheresse herself recognized the Dayton and Cincinnati stores were "a whole lot more profitable" than the two Columbus stores. (Tr. Vol. III at 270.)

{¶ 54} While it is true, as Ms. Vacheresse points out (*see* Appellant's Brief at 15-16), the trial court found Mr. Paulchel lacked credibility in several areas (Divorce Decree at 3), nothing in the record refutes or otherwise suggests his testimony about the profitability of and growth potential for the Cincinnati and Dayton DMAs was not credible. Indeed, his testimony on this matter is bolstered by virtue of the fact that both parties requested to be awarded the Cincinnati DMA. (Tr. Vol. III at 214-20, 270; Tr. Vol. IV at 342-43, 359-60.)

{¶ 55} Moreover, although only Mr. Paulchel was named in the three Good Feet franchise agreements for the contested Columbus, Cincinnati, and Dayton DMAs, Ms. Vacheresse testified extensively about her involvement in the stores and good relationship with Good Feet's corporate team and her employees at the Cincinnati and Dayton stores. (*See, e.g.*, Tr. Vol. II 52-85; Tr. Vol. III at 173-75, 214-23, 270. *Compare* Tr. Vol. III at 296-307; Tr. Vol. IV at 356-60.) She recounted how her previous training in podiatric medicine has "immensely" contributed to her success in running these Good Feet stores (Tr. Vol. II at 68-69), and repeatedly expressed that, although both were opened during the parties' marriage, the Cincinnati and Dayton locations had always been "[her] stores" (*see, e.g.*, Tr. Vol. II at 77, 132, 135, 141, 172, 211, 214-15, 217-19, 270, 277, 280). (*Compare* Tr. Vol. IV at 356-60.) Ms. Vacheresse testified that Good Feet corporate "loved" the podiatry knowledge she brought to the stores and, at one point, made her the "trainer for pathology" for persons trying to become "pedorthists." (Tr. Vol. II at 68-69.) Suffice it to say that there is nothing in the record to suggest Good Feet corporate would not be amenable to Ms. Vacheresse

taking over and expanding the Cincinnati and Dayton Good Feet DMAs independent of Mr. Paulchel.

{¶ 56} Ms. Vacheresse indicated she intended, if awarded both the Cincinnati and Dayton DMAs, to continue working. (Tr. Vol. II at 82-85.) In light of Mr. Paulchel's unchallenged testimony about the growth potential of both the Cincinnati and Dayton DMAs, we thus find the trial court's determination that the difference in the distribution of marital assets would, in time, be offset by the considerable income earned from the Cincinnati and Dayton DMAs that were awarded to Ms. Vacheresse to be supported by competent, credible evidence. (*See* Divorce Decree at 21.)

{¶ 57} Ms. Vacheresse also contends the trial court's second reason for finding an equalization payment would be inappropriate in this case—potential for significant infusions of cash from the real estate being sold—is not supported by the trial court's decision. (Appellant's Brief at 14-15.) We disagree.

{¶ 58} Prior to trial, the parties stipulated to the sale-and-split of the Cincinnati marital property, but they reached no agreement regarding the Johnstown and Springboro properties. (*See* Divorce Decree at 3-5.) Ultimately, the trial court ordered the parties to sell all three real estate assets in the marital estate and equally split the proceeds therefrom. (Divorce Decree at 16-17.) However, the trial court also awarded Mr. Paulchel the option to purchase the Johnstown property (marital value of $260,904.53) and Ms. Vacheresse the option to purchase the Springboro property (marital value of $98,353.26). (Divorce Decree at 17.)

{¶ 59} On appeal, Ms. Vacheresse suggests she would not see a significant infusion of cash "if the real estate is retained[]" because the marital value of the Johnstown property "is worth nearly three times" that of the Springboro property. (Appellant's Brief at 14. *See* Divorce Decree at 21.) We note, however, that the divorce decree did not merely award Mr. Paulchel one property and Ms. Vacheresse the other. To the contrary, the trial court ordered a sale-and-split arrangement for both properties but gave each party the "option to refinance the home and buyout [the other party's] portion of [their] equity in [each] home." (Divorce Decree at 17.) If Mr. Paulchel decides to exercise this option and keep the Johnstown property, he is ordered to pay Ms. Vacheresse "50% of the value of the property, minus the refinanced debt[.]" (Divorce Decree at 17.) Ms. Vacheresse was given the same

option, conditioned upon the same requirement if exercised, as to the Springboro residence.  (*Id.*)  In light of these terms, then, Ms. Vacheresse's contention that the trial court's decision does not support the trial court's reasoning is not well-taken.  If Mr. Paulchel exercises his option and retains the Johnstown property, Ms. Vacheresse will still receive "50% of the value of the property, minus the refinanced debt[.]"  (Divorce Decree at 17.) In such event, Ms. Vacheresse would be expected to "see [a] significant infusion[] of liquid capital[.]" (*See* Divorce Decree at 21.)

{¶ 60}  For these reasons, and based on our review of the record, we conclude the trial court did not abuse its discretion by finding it would be inequitable in this case to require Mr. Paulchel to make a $360,875 equalization payment to Ms. Vacheresse. Accordingly, Ms. Vacheresse's first assignment of error is overruled.

## III.  CONCLUSION

{¶ 61}  Having overruled Ms. Vacheresse's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed.*

LUPER SCHUSTER and MENTEL, JJ., concur.